IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MELVIN BERNARD THOMPSON,
     Plaintiff,

v.                            Case No.  5:09cv73/RS/EMT

MONICA McCALL WINDSOR,
     Defendant.
_____/

## ORDER, REPORT AND RECOMMENDATION

Plaintiff Melvin Bernard Thompson ("Thompson") proceeds pro se and in forma pauperis in this action brought pursuant to 42 U.S.C. § 1983.  Presently before the court is the Second Motion for Summary Judgment filed by Defendant Monica McCall Windsor ("Windsor") (Doc. 218). Thompson filed a Response in opposition to the motion for summary judgment, which includes a statement of material facts in dispute as to which he contends there exists a genuine issue to be tried, as well as a memorandum of law and supporting evidentiary material (Docs. 229, 230, 232, 234).[1] Also before the court is Thompson's Motion to Strike (Doc. 228), and Windsor's response in opposition (Doc. 237).   As set forth below, Thompson's motion to strike will be denied. Additionally, the court recommends that Windsor's Second Motion for Summary Judgment be granted.

I.      BACKGROUND

Thompson, an inmate of the Florida Department of Corrections ("FDOC"), initiated this action by filing a civil rights complaint on March 6, 2009 (Doc. 1).  The case was referred to the

---

[1] In addition to the statement of material facts in dispute incorporated into Thompson's Response (*see* Doc. 229 at 2), Thompson filed a separate Statement of Material Facts in Dispute (Doc. 231).  However, in the separate Statement, he clearly states that the disputed facts included therein are the same disputed facts included in his Response (Doc. 229); indeed, he describes the separate Statement as a condensed version of the disputed facts included in his Response (Doc. 231 at 1–2).  Therefore, the court considers the statement of facts incorporated into Thompson's Response as the statement of material facts in dispute for purposes of Rule 56.1(A) of the Local Rules for the Northern District of Florida.

undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive motions. *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b). In the Third Amended Complaint (Doc. 59), which is the operative pleading in this case, Thompson asserts that Windsor was deliberately indifferent to his medical need for replacement soft shoes, in violation of the Eighth Amendment (*id.* at 5–12).[2] Thompson sues Windsor in both her individual capacity and her official capacity as Health Services Administrator ("HSA") at the Annex of the Northwest Florida Reception Center ("NWFRC") (also known as Washington Correctional Institution) from March 2007 to April of 2009, and Acting HSA of the Main Unit of the NWFRC from December of 2007 through March of 2008 and again in October of 2008 (Doc. 59 at 2; Doc. 218, Ex. A, Windsor Aff. ¶ 3). As relief, Thompson seeks injunctive and declaratory relief, compensatory and punitive damages, nominal damages, and costs (Doc. 59 at 12).

Windsor filed her first motion for summary judgment on January 25, 2010 (Doc. 101). The court issued an advisement order informing the parties of the importance and ramifications of summary judgment consideration and provided them with information as to the requirements for materials submitted for Rule 56 review (Doc. 105). Thompson filed a response in opposition to the motion for summary judgment (Docs. 161, 163). The undersigned recommended that Windsor's motion for summary judgment be granted only as to Thompson's claims for monetary damages against Windsor in her official capacity, and that the motion be denied in all other respects (Doc. 178). The District Judge adopted the recommendation on August 5, 2010 (Doc. 192).

On August 23, 2010, the District Judge granted Windsor's request to file a second motion for summary judgment (Docs. 195, 198). Windsor then filed her Second Motion for Summary Judgment, with supporting evidentiary materials (Doc. 218). Thompson filed a Motion to Strike Windsor's motion (Doc. 228). Thompson additionally filed a Response to the motion, with supporting materials on November 4, 2010 (Docs. 229, 230, 231, 232, 234). Upon leave of court, Windsor filed a Reply (Doc. 238). Thompson sought leave to file a "cross-reply" (Doc. 239), which

---

[2] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Windsor opposed (Doc. 240).   The undersigned denied Thompson's request to file further memoranda on the ground that he failed to show good cause for doing so (Doc. 241).

II.     THOMPSON'S MOTION TO STRIKE

The court will first address Thompson's motion to strike (Doc. 228).  Thompson asserts four grounds for his motion:  (1) Windsor's Second Motion for Summary Judgment should be stricken because it was not timely filed; (2) Dr. Johanson's affidavit should be stricken because it was not timely filed; (3) portions of the affidavits of Dr. Ciungu and Dr. Johanson should be stricken because they constitute expert opinions, despite Windsor's assertion, in her opposition to Thompson's motion  for appointment of medical experts (*see* Docs. 209, 210), that these doctors would not be providing expert opinions as to Thompson's health condition but only discussing the findings of those clinicians who personally evaluated Thompson; and (4) Windsor's discussion of Thompson's medical records—as they pertain to Thompson's diabetes and neuropathy in his feet and the treatment he received by Dr. Isra and Dr. Ananjiwali for those conditions—should be stricken because it constitutes improper joinder of unrelated claims (Doc. 228).

None of Thompson's grounds are meritorious.  First, Windsor received permission from the court to file a Second Motion for Summary Judgment beyond the dispositive motions deadline established in the scheduling order (*see* Doc. 198), and Windsor filed the motion on September 24, 2010, the deadline established by court in the order granting Windsor permission to file it (*see* Docs. 198, 218).  Therefore, Windsor's motion was not untimely.

Second, although Dr. Johanson's affidavit was not signed by him when Windsor submitted it with the timely Second Motion for Summary Judgment, Windsor showed good cause for failing to submit the signed version (which was identical to the timely unsigned version) and filed the signed version six (6) days later (Doc. 222).  Furthermore, the signed affidavit was submitted prior to the advisement date set forth in Rule 56.1(B) of the Local Rules.  Therefore, Thompson's request to strike Dr. Johanson's affidavit will be denied.

Third, Thompson has failed to show that portions of the affidavits of Dr. Ciungu and Dr. Johanson should be stricken on the ground that they constitute expert opinions.  Thompson has failed to show that the affidavits set out facts that would not be admissible in evidence, or that either affiant is not competent to testify on the matters stated.  Furthermore, Thompson made no showing,

in either his motion to appoint independent medical experts or his motion to strike, that the opinions of Dr. Ciungu or Dr. Johanson had no reasonable medical basis or that they are unqualified to give such opinions. Therefore, Thompson's motion to strike any expert testimony included in their affidavits will be denied.

Fourth, Thompson's contention that the discussion of his medical records as they pertain to his diabetes and neuropathy in his feet and the treatment he received from Drs. Isra and Ananjiwali for those conditions should be stricken because it constitutes improper joinder of unrelated claims is without merit. Windsor's discussion of Thompson's medical issues does not constitute an assertion of a claim against him, nor has Windsor sought to join additional parties to this lawsuit. Therefore, Thompson's argument is without merit. For these reasons, Thompson's motion to strike will be denied.

## III.    MATERIAL FACTS

As this case comes before the court on the Second Motion for Summary Judgment filed by Windsor, the court views the facts in the light most favorable to Thompson, the non-moving party, see Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. See Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997). The court conveys only those facts that are material.

Additionally, any facts included in Windsor's statement of undisputed material facts that are not controverted by Thompson's statement of facts are deemed admitted.[3] See N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by statement required to be filed and served by opposing party).

---

[3] As previously discussed, the court considers the statement of material facts in dispute incorporated into Thompson's Response as his Rule 56.1(A) statement (see Doc. 229 at 3–25)

Finally, with regard to the factual positions asserted by the parties, the court applies the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if Windsor's motion and supporting materials—including the facts considered undisputed—show that Windsor is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Applying these standards, the court conveys the following as the material facts.  Pursuant to the policy of the Florida Department of Corrections ("FDOC"), inmates incarcerated by the FDOC must wear either Bobos or Brogans (Doc. 222, Ex. B, Aff. of Dr. Frank Johanson ¶ 3).[4] Bobos are a type of cloth shoes (*id.*).  Brogans are a type of leather shoes (*id.*).  As a exception to this shoe policy, and pursuant to the FDOC's Technical Instruction No. 15.02.06 for Therapeutic Shoes ("FDOC Special Shoe Policy"), an inmate's clinician within the health services department of the inmate's custodial institution may prescribe a pair of special shoes, including therapeutic and

---

[4] Unless otherwise indicated, references to exhibits are to the exhibits submitted by Windsor with her Second Motion for Summary Judgment (Doc. 218), except references to Dr. Johanson's affidavit are to his signed affidavit submitted as Doc. 222 (identified, in Doc. 222, as "Exhibit B" for the second summary judgment motion (Doc. 218)).

soft shoes, to be worn by the inmate when he or she has a special health-related situation where the typical shoes issued by the FDOC cannot be used (Ex. B, Johanson Aff. ¶ 3; *see also* Ex. C).  The clinician can prescribe a Health Slip/Pass which allows, for FDOC security purposes, the inmate to possess and wear the special shoes (Ex. B, Johanson Aff. ¶ 3).  Furthermore, the clinician can prescribe a pair of special shoes to be provided to the inmate by the institution's health services department (Ex. B, Johanson Aff. ¶ 5).  The FDOC's Special Shoe Policy provides subjective guidelines for a clinician to determine, based on his or her judgment, whether special shoes are necessary, and provides the instructions for issuance of special shoes (Johanson Aff. ¶ 5; *see also* Ex. C).  For purposes of the FDOC Special Shoe Policy, "therapeutic shoes" are specifically defined as "[s]hoes that are designed or altered to provide a therapeutic benefit or accommodation of a specific foot or lower extremity disorder," and "soft shoes" are defined as "[s]hoes that are typically defined as tennis shoes, sneakers, running shoes, and athletic shoes" (Ex. C).  Consequently, while by clinical definition "therapeutic shoes" are considered to include both orthopedic and soft shoes, according to the FDOC Special Shoe Policy, "therapeutic shoes" include only orthopedic shoes, not soft shoes (Ex. B, Johanson Aff. ¶ 5).  The FDOC Special Shoe Policy specifically outlines that therapeutic shoes or soft shoes may be prescribed for a limited time to address an inmate's post-surgical recuperation or recent foot trauma (for example, where the inmate has had broken bones which do not require surgery) (Ex. B, Johanson Aff. ¶¶ 6, 8; Ex. C).  The Special Shoe Policy also provides that an orthotic device, including orthopedic inserts and orthopedic shoes, may be prescribed if the inmate's condition demonstrates an observable significant foot deformity (Ex. B, Johanson Aff. ¶¶ 6, 8; Ex. C).  However, in many cases the inmate would only need to be issued an orthopedic insert (arch supports) which can then be used in the inmate's Brogans (Ex. B, Johanson Aff. ¶ 8; Ex. C).  Additionally, the FDOC Special Shoe Policy allows a clinician some discretion to prescribe special shoes to an inmate for a limited time to address the inmate's health needs (for example, reoccurring wounds, foot erosions, or foot infections) (Ex. B, Johanson Aff. ¶ 6).  When a clinician determines that soft shoes are necessary, these type of shoes can be purchased through a typical retailer, such as Wal-Mart or K-Mart. (*id.*).  The FDOC Special Shoe Policy does not expressly allow for the issuance of special shoes merely based on a "neurological condition" (Ex. B, Johanson Aff. ¶ 7).  This criteria was removed from the April 11, 2003, version of the policy (*id.*).

Nevertheless, the policy does allow a clinician discretion with prescribing special shoes for a patient with a neurological condition when the clinician determines it is justified by the results of appropriate testing or other clinical indicators (*id.*).

Pursuant to the FDOC Special Shoe Policy, an institution's health services department may provide a pair of special shoes to an inmate patient on an annual basis (Ex. B, Johanson Aff. ¶¶ 9–11; Ex. C; Ex. D, Aff. of Dr. John Ciungu ¶ 3). The special shoes or Health Slip/Pass or both is prescribed by a clinician, who evaluates the inmate patient's need and then completes a prescription for the shoes based on the evaluation (Ex. D, Ciungu Aff. ¶ 3). For a prescription to be completed, the clinician will initiate and forward the order, signed by them, to the treating physician, the physician then completes the order and hands the order to the clinician who hands the file to the medical secretary of the Chief Health Officer ("CHO") for processing (Ex. D, Ciungu Aff. ¶ 4). Pursuant to the FDOC Special Shoe Policy's one-year rule, when a pair of special shoes are issued to an inmate patient, the inmate must acknowledge receipt of the special shoes by completing an Acknowledgment Receipt of Therapeutic Shoes form (DC4- 774) (Ex. B, Johanson Aff. ¶ 9; Ex. C at 2). This acknowledgment form is signed by the inmate, signed by a witness, stamped, and dated (Ex. C at 2). By signing this form, the inmate patient acknowledges that the replacement cost for another pair of shoes will be the obligation of the inmate if such is needed in less than a year (Ex. B, Johanson Aff. ¶ 9; Ex. C at 2). Before acknowledging receipt of a pair of special shoes, the inmate patient should check whether the shoes fit by trying them on (Ex. B, Johanson Aff. ¶ 10). If the shoes do not fit, the patient should immediately comment that the shoes are inappropriate, refuse the shoes, and request another pair of a different size (*id.*). Once the patient acknowledges receipt, the matter is closed, and there is a record indicating that the patient received the appropriate pair of shoes (*id.*).

When the patient requires a replacement pair in less than a year, the patient must obtain a replacement pair of soft shoes at his or her own expense through the inmate canteen, or have his health concerns addressed at a clinic consultation (for example, the Endocrine Clinic, Brace Clinic, or a medical consult call-out), where a clinician can personally evaluate whether the patient's medical needs justify replacing previously issued shoes in less than one year (Ex. B, Johanson Aff. ¶ 10; Ex. D, Ciungu Aff. ¶ 6). For atypical circumstances, there is an exception to the FDOC

Special Shoe Policy's one-year rule which allows the CHO or treating physician some freedom of judgment to inquire with the institution's supervising administration to balance the benefit and risk of not offering special shoes to an inmate with medical problems earlier than one year (Ex. B, Johanson Aff. ¶ 11; Ex. C at 2; Ex. D, Ciungu Aff. ¶ 5). Supervising administration includes the assistant warden, warden, or the CHO (Ex. B, Johanson Aff. ¶ 11). A lower administrative employee, such as an HSA, does not have discretion to exceed the scope of this policy without the approval of a supervisor, such as a physician, nurse practitioner, an assistant warden, or a warden (*id.*). An example of an application of this exception is where an inmate has a hard labor job assignment which wears the shoes down within seven or eight months (*id.*).

Windsor was the acting HSA for the NWFRC Main Unit during the times relevant in this action (*see* Ex. A). As the HSA, she is responsible for directing the administrative aspect of the health services department, including assuring that inmate requests and grievances (informal and formal) are answered in accordance with the authorized medical care and in accordance with FDOC rules and procedures, and purchases (Ex. A; Ex. E). When responding to inmate requests and grievances, she reviews the inmate's medical record and only consults with a medical provider when appropriate (Ex. A). Windsor does not have authority to override decisions of medical providers (*id.*).

On October 9, 1997, Thompson was received into the custody of the FDOC (Ex. F at 1). His prior medical history was documented in his FDOC file (*see* Doc. 163, Exs. B1–B7). Those records showed that in 1989 or 1990, he had surgery for an osteochondritis dissecans ("OCD") of the modial femoral condyle of his right knee (Doc. 163, Exs. B1, B3, B4, B6, B7). In 1991, an MRI showed petellar polar spurring chonodromalacia, in addition to OCD; therefore, a second surgery was performed on his right knee in July of 1992 (Doc. 163, Exs. B6, B7). In October of 1994, Thompson was examined for pain in his left knee (Doc. 163, Exs. B3, B7). A pea-sized area of OCD was discovered in his left knee; however, Dr. David Ochs determined that Thompson's discomfort was likely caused by a simple sprain, rather than the small area of OCD (Doc. 163, Ex. B7). In December of 1994, Thompson was examined due to pain in his right knee (Doc. 163, Ex. B6). X-rays showed the patellar spurring, but no residual evidence of OCD in his right knee (*id.*).

On October 22, 2001, when Thompson was in the FDOC, Dr. Lord, an orthopedic specialist, performed surgery on Thompson's left knee for osteochondral defect medial femoral condyle (Doc. 163, Ex. B12).  Dr. Lord conducted a post-operative examination on October 29, 2001, and noted that Thompson had permanent damage to the articular surface of his left knee, which necessitated permanent restrictions including avoiding certain activities and stairs, avoiding excessive activity with his left knee, being assigned a low bunk unless a ladder was available, and being provided a device to elevate his left knee (Doc. 163, Ex. B13).  A Health Slip/Pass was issued to effectuate these restrictions (Doc. 163, B14).

On March 1, 2002, Thompson was issued soft shoes (Doc. 163, Exs. B15, B16).  About one year later, on March 12, 2003, Dr. Tran issued a physician's order for Thompson to receive a pair of soft shoes, which Thompson received on April 11, 2003 (Doc. 163, Exs. B18, B19).

On November 25, 2003, Dr. Gama, a neurologist, examined Thompson regarding his complaint of foot pain (Doc. 163, Exs. B21, B22).  Dr. Gama determined that the pain was possibly secondary to diabetic polyneuropathy; and he suspected Thompson's flat feet aggravated the pain (Doc. 163 at B21).  Dr. Gama also noted the possibility of plantar fascitis; but he ruled out peripheral neuropathy and osteoarthritis as a potential cause of the foot pain (Doc. 163, Exs. B21, B22).

On July 9, 2004, Thompson received a consultation with a podiatrist, who diagnosed plantar fascitis and recommended soft shoes and a consultation for orthotics (Doc. 163, Exs. B23, B23(a)). Thompson received Spot Bilt shoes July 16, 2004 (Doc. 163, Ex. B24).

On February 13, 2006, Nurse Practitioner Wilson initiated a consult request for Thompson to be fitted for foot orthotics based on a provisional diagnosis of plantar fasciitis (Ex G at 1; Ex. H at 1).  This request was not approved by the CHO (*see* Ex. I at 2).

On June 26, 2006, Thompson had arthroscopic surgery on his left knee (Doc. 163, Exs. B27, 28).  On July 18, 2006, Thompson had a post-surgical consultation with Dr. Lord, who recommended a treatment plan which included confinement to a wheelchair for three months (Ex. B, Johanson Aff. ¶ 12; Ex. H at 4–6).  Dr. Lord also noted that Thompson requested "cushion shoes" (*id.*).  Following this consultation, Thompson requested a replacement pair of Spot Bilt tennis shoes and orthotics in a formal grievance submitted on July 24, 2006 (Ex. I).  This formal grievance was denied, with the response stating in pertinent part:

> On 4/11/03, you received Spotbilt hightop boots that were ordered by H. McCluney, brace specialist.  You received another pair on 7/16/04.  There is no recommendation in your chart from either Dr. Makoff or Dr. Lord for a brace clinic appointment.  On 2/13/06 referral to orthotics was made by M. Wilson, ARNP at Jefferson CI, but it was never approved nor scheduled by your Chief Health Officer.  You have the option of signing up for sick call to discuss this issue.

(*id.*).  The acknowledgment forms documenting Thompson's receipt of the shoes on the referenced dates (April 11, 2003 and July 16, 2004) were attached to this grievance response (*id.*).  As a consequence of Thompson's requests, he was seen by the Brace Clinic in August and September of 2006, where semi-rigid orthotics with Saucony soft shoes were recommended for plantar fasciitis (Ex. B, Johanson Aff. ¶ 12; Ex. H at 7–9).  The Brace Clinic then issued him a pair of  size 12E Saucony (Spot Bilt) soft shoes, model 996-8, on September 22, 2006 (Ex. J).  Plantar fasciitis is an acute condition caused by temporary inflammation due to trauma of the foot fascia, which is the contact surface of the foot with the ground (Ex. B, Johanson Aff. ¶ 13; Ex. D, Ciungu Aff. ¶ 11).  It is typically associated with running or jogging, and most commonly seen in athletes (Ex. B, Johanson Aff. ¶ 13).  Optimally, rest along with a Health Slip/Pass (a pass for no lifting, no work, and assignment to a low bunk) should be prescribed to address this condition in order to reduce the amount of impact on the heel of the foot and subsequently reduce the temporary inflammation associated with the condition (Ex. B, Johanson Aff. ¶ 13; Ex. D, Ciungu Aff. ¶ 11).

Thompson was transferred to NWFRC on February 20, 2007 (Ex. F at 5–7).  In October of 2007, he submitted an inmate request for a new pair of soft shoes to replace his deteriorated shoes (Ex. D, Ciungu Aff. ¶ 8; Ex. K).  HSA Street forwarded Thompson's chart to CHO Dr. Ciungu for evaluation of Thompson's request (Ex. L at 1).  Pursuant to the FDOC Special Shoe Policy, because over a year had occurred since the FDOC issued him a pair of special shoes, a pair of orthopedic or soft shoes could be provided to him (Ex. D, Ciungu Aff. ¶ 9).  Dr. Ciungu prescribed, and Nurse Paridon co-signed, the purchase of a pair of soft shoes for Thompson to address his present need for wearable shoes (Ex. D, Ciungu Aff. ¶¶ 10–13; *see also* Ex. B, Johanson Aff. ¶ 14).  These soft shoes were prescribed by Dr. Ciungu to address Thompson's poorly controlled diabetes and his increased risk of foot erosions and foot infections (Ex. D, Ciungu Aff. ¶ 10; *see also* Ex. B, Johanson Aff. ¶ 14; Ex. L at 1).  To be well controlled, a diabetic's Hemoglobin ("Hg") A1C level should ideally

be 7.0 or below (Ex. D, Ciungu Aff. ¶ 10; Ex. B, Johanson Aff. ¶ 14).  However, Thompson's Hg A1C level on October 1, 2007, was 8.1 (Ex. D, Ciungu Aff. ¶ 10; Ex. L at 1–2; Ex. B, Johanson Aff. ¶ 14).  On October 24, 2007, Thompson acknowledged receipt of a pair of soft shoes purchased at Wal-Mart, verbalized satisfaction for the issued shoes, and acknowledged that a replacement pair would be his obligation if needed in less than one year (Ex. D, Ciungu Aff. ¶¶ 12–13; Ex. B, Johanson Aff. ¶ 14; Ex. M).  This acknowledgment was witnessed by Ms. A. Street, the HSA (*id.*).  Indeed, Thompson admits in his affidavit that he tried on the shoes in Ms. Street's office and stated that he was satisfied with the fit, even though they were a bit tight (Doc. 234, Affidavit of Melvin Thompson ¶ 20).  Thompson states that upon walking in the shoes for the rest of the day, he observed that they were still too tight and not sufficiently shock absorbent (Doc. 234, Thompson Aff. ¶ 20).  He intended to inform Ms. Street of this the next day, on October 25, 2007, but was temporarily transferred to another institution (Ex. F at 5; Ex. 234, Thompson Aff. ¶¶ 20–21).

In an inmate request dated November 29, 2007, the day after Thompson's return to NWFRC, Thompson requested a replacement pair of shoes because his feet slipped out of the new shoes upon his inserting his orthotics in them, and the shoes were not sufficiently shock-absorbent (Ex. F at 5; Ex. N).  On November 30, 2007, Windsor responded as follows:

> Shoes were received on October 24, 2007.  You are allowed one pair of shoes per year.  A replacement pair may be purchased at your own expense.  You may submit a new inmate request, if you have funds available for shoe purchase.

(*id.*).  In a formal grievance dated December 1, 2007, Thompson requested a consult to the Brace Clinic specialist to receive better fitting shoes (Ex. O).  Because the CHO is the primary supervisory administrator responsible for investigating and responding to medically-related formal grievances (*see* Ex. B, Johanson Aff. ¶ 20), Thompson's file came to the attention of Dr. Ciungu (Ex. D, Ciungu Aff. ¶ 14).  Dr. Ciungu believed that the only way of obtaining a pair of the requested orthopedic shoes was through the Brace Clinic, but he also knew that obtaining a consultation with a specialist could not be expedited (Ex. D, Ciungu Aff. ¶¶ 7, 14–18).  Hence, on December 12, 2007, Dr. Ciungu requested the medical secretary, Ms. J. Jackson, to determine whether the Brace Clinic could send a pair of Spot Bilt shoes directly to NWFRC that were similar to the pair Thompson received in September of 2006 (*id.*, ¶ 14).  As a consequence of this request, Thompson's medical records

erroneously indicated that on December 12, 2007, Ms. Jackson forwarded Thompson's file to Windsor to purchase shoes; and Windsor contacted the warehouse to place a shoe order, leaving a message (*id.*, ¶¶ 16, 17; Ex. L at 9). However, Dr. Ciungu did not intend to prescribe a pair of Spot Bilt shoes or to otherwise order the administration to purchase shoes for Thompson; he was simply attempting to address Thompson's request for shoes in the most expeditious manner possible because he believed the only method of obtaining the type of orthopedic shoes requested by Thompson was through a Brace Clinic consultation (Ex. D, Ciungu Aff. ¶¶ 16, 17). Additionally, Ms. Jackson was not authorized to order shoes without written authorization from a clinician, which is then co-signed by another clinician (*id.*, ¶ 16). Because Dr. Ciungu was unaware of a method to purchase a pair of orthopedic shoes other than through the Brace Clinic, he initiated a Brace Clinic consult request on January, 16, 2008 (*id.* ¶¶ 17, 18).

After Thompson was transferred to and from the RMC for a consultation with Dr. Lord regarding his right wrist, Thompson signed the Brace Clinic consult request on March 4, 2008 (Ex. D, Ciungu Aff. ¶¶ 19–20; Ex. P at 9–10). Also on that date, Thompson was seen by Nurse Barefoot, pursuant to his request for renewal of Health Slips/Passes (Ex. B, Johanson Aff. ¶ 14; Ex. L at 21). Nurse Barefoot renewed Thompson's passes for no pushing, no lifting, no pulling, no shave, low bunk, and soft shoes (*id.*). On March 26, 2008, the Brace Clinic request was denied by the FDOC's Utilization Management ("UM") (Ex. Q). The denial letter, signed by Dr. Thayer, the Region II Physician Advisor Committee Chairman, stated that the reason for the denial was that soft shoes could be provided by Thompson's institution (*id.*). The denial letter was received by the medical secretary, Ms. J. Jackson, on April 10, 2008 (Ex. B, Ciungu Aff. ¶ 21; Ex. L at 23). The content of the letter was not noted in Thompson's medical file (Ex. B, Ciungu Aff. ¶ 21; Ex. L at 23). An administrator, such as a HSA would have no knowledge of the content of a response from UM because the responses come directly to the CHO's office or to the medical secretary (Ex. B, Ciungu Aff. ¶ 21).

Thompson states that during a consultation with Dr. Isra in the Endocrine Clinic on July 3, 2008, he showed Dr. Isra his deteriorating shoes and attempted to explain that he was having problems with the shoes, but Dr. Isra rejected his request for new shoes (Doc. 234, Thompson Aff. ¶ 46). This conversation was not noted in Thompson's medical records (*see* Ex. R at 4).

Thompson's medical records from that consultation show that Dr. Isra assessed Thompson's medical condition as diabetes with peripheral neuropathy (*id.*).

On July 9, 2008, Thompson filed a formal grievance, Log Number 0807-125-013, stating that Dr. Ciungu had ordered Windsor to purchase shoes for him, stating he suffered from diabetic neuropathy in both feet, complaining that his shoes did not fit properly and that he had been denied a Brace Clinic consult, and requesting that he be provided orthopedic Spot Bilt tennis shoes (Ex. T). Dr. Syed, the CHO at NWFRC, denied the grievance on the ground that here was no order in Thompson's medical file from Dr. Ciungu for medical soft shoes per technical instructions (*id.*; Ex. B, Johanson Aff. ¶¶ 15, 19–20). Dr. Syed advised Thompson that neuropathy and flat feet did not qualify him for a soft shoe, and he (Thompson) could further address the issue during his follow-up appointment at the end of July (Ex. T; Ex. B, Johanson Aff. ¶¶ 19–20).

On July 22, 2008, Thompson was seen by Dr. Syed (Ex. L at 35; Ex. B, Johanson Aff. ¶ 15). Thompson complained of his feet burning and a feeling he could not describe (*id.*). As a result of this consultation, Dr. Syed made a clinical diagnosis that Thompson suffered from neuropathy and prescribed a generic drug equivalent to Neurontin (*id.*). Neurontin is a medication used to inhibit pain produced by various conditions, including diabetes neuropathy (Ex. B, Johanson Aff. ¶ 16). A clinical diagnosis that a patient exhibits symptoms indicating neuropathy does not necessarily mean that the patient actually suffers from neuropathy (*id.*). For a clear diagnosis of neuropathy, a neurological evaluation must be performed which consists of a nerve conduction study and an electromyography (*id.*). Neuropathy starts in the feet, then into the legs, hands, and arms (*id.*). Thompson had an objective test for neuropathy performed on June 21, 2007, on his upper extremities, which involved a nerve conduction study and an electromyography, and the test did not show he had neuropathy (*id.*; Ex. P). Neuropathy is not associated with wearing any specific type of shoe, but is alleviated by the patient controlling and monitoring his diabetes (Ex. B, Johanson Aff. ¶ 17). During Dr. Syed's consultation on July 22, 2008, he noted patchy discolored or dark spots from old infections, but they did not appear as scars (*see* Ex. L at 35). He noted no foot abnormalities and made no recommendation for shoes (Ex. B, Johanson Aff. ¶ 15; Ex. L at 35). Controlling and monitoring diabetes requires the patient's compliance with the medication program offered to the patient, including his attendance at scheduled clinic check-ups, which are typically

scheduled on a quarterly basis, and accepting Accu-checks to check his blood sugar levels (Ex. B, Johanson Aff. ¶ 17). Thompson's quarterly check-ups at the Endocrine Clinic from October of 2007 to April of 2009 (one month after he filed the instant lawsuit) showed that his Hg A1C level was above the optimum 7.0 level (Ex. B, Johanson Aff. ¶ 18; Ex. R). Further, Thompson refused his insulin a week before the consult with Dr. Syed (Ex. B, Johanson Aff. ¶ 18; Ex. S at 1).

On July 25, 2008, Thompson submitted an inmate request to the HSA, Windsor, complaining about his shoes (*see* Ex. U). Pursuant to the FDOC Special Shoe Policy, Windsor denied the request (*id.*; *see also* Ex. D, Ciungu Aff. ¶¶ 5–6). Additionally, on August 5, 2008, after Thompson had already received Dr. Syed's denial of his July 9 formal grievance, Thompson submitted an informal grievance to Windsor, complaining that his existing shoes were deteriorating and did not fit, and requesting that health services replace the shoes or that he be permitted to obtain a replacement pair from his family, since the shoes he sought were not available in the canteen (Ex. V; Doc. 163, Exs. C-25, C-25(a); Doc. 230 at 12). Windsor denied the grievance, informing Thompson that his options were to continue wearing the shoes or purchase shoes from the canteen (Ex. V). Prior to 2007, if an inmate did not have the capability of purchasing the soft shoes he wanted from the canteen, he could have a family member send a pair of shoes directly to him; however, in 2007 and thereafter, the FDOC disallowed this practice due to security reasons (Ex. B, Johanson Aff. ¶ 4).

On September 25, 2008, Thompson was seen by Nurse Wynn, pursuant to a sick call request (Ex. B, Johanson Aff. ¶ 21; Ex. L at 47–48). Thompson complained of several medical issues, one of which was his need for replacement Spot Bilt shoes due to his flat feet and avacular neurosis (Ex. L at 48). Nurse Wynn scheduled Thompson to be seen by a nurse practitioner regarding his request for shoes (*id.*). As a result, Thompson was seen by Nurse Practitioner Dowling on October 1, 2008, who noted that Thompson's records did not show any prescription or recommendation for soft shoes by an orthopedist or a podiatrist, and noted that he had no observable lesions on his feet (Ex. B, Johanson Aff. ¶ 21; Ex. L at 49).

On October 28, 2008, during an Endocrine Clinic consult with Dr. Schafer, Dr. Schafer noted decreased sensation over the dorsum and lateral aspect of Thompson's feet (*see* Ex. B, Johanson Aff. ¶ 22; Ex. R at 5). Dr. Schafer assessed Thompson's condition as poorly controlled diabetes and recommended continued monitoring of the diabetes, an adjustment of Thompson's medication, a

2800 calorie diet, and new footwear (Ex. B, Johanson Aff. ¶ 22; Ex. R at 5).  Nurse Practitioner Dowling renewed Thompson's Health Slip/Pass for soft shoes on October 31, 2008 (Ex. B, Johanson Aff. ¶ 22; Ex. L at 50–68; Ex. R at 5).  As previously noted, the soft shoe pass permitted Thompson to purchase soft shoes from the canteen and provided authorization with FDOC security for him to possess and wear the special shoes (Ex. B, Johanson Aff. ¶ 3).

On November 16, 2008, Nurse Wynn (who is not a nurse practitioner) sent Thompson's chart to Ms. Charity Pleas, Windsor's secretary, to order Spot Bilt shoes (*see* Ex. L at 57; *see* Doc. 163, Windsor's Resp. to Thompson's Second Set of Interrogatories, Interrog. #30).  The next day, Thompson's chart was sent to a clinician for clarification of Dr. Schafer's orders (*see* Ex. L at 55, 57).  On November 19, 2008, Thompson was seen by Physician's Assistant Salvador (Ex. B, Johanson Aff. ¶ 23; Ex. L at 58–60).  During this consultation, Thompson demanded orthopedic footwear and Neurontin, but Physician's Assistant Salvador evaluated Thompson's feet, finding no gross deformities which would justify a special shoe and instructing Thompson that he could purchase his own soft shoes from the canteen (Ex. B, Johanson Aff. ¶ 23; Ex. L at 58–60).

On November 25, 2008, Thompson had a consultation with Nurse Practitioner Carroll (*see* Ex. B, Johanson Aff. ¶ 23; Ex. L at 61–62).  This consultation occurred after Thompson refused Lantus and Tegretol (Ex. L at 61–62; Ex. S at 3).  During this consultation, Thompson complained of a callous on his left foot and requested special shoes (Ex. L at 61–62).  Nurse Practitioner Carroll noted a small plantar callosity on Thompson's left foot (*id.*).  Even though Thompson was instructed that Lantus and Tegretol were necessary to control his diabetes, he still refused the medication, stating that Lantus made him sick and he did not want to take Tegretol because Neurontin worked well (Ex. B, Johanson Aff. ¶ 24; Ex. L at 61–62).  Nurse Practitioner Carroll completed a drug exemption request ("DER") for Neurontin (Ex. B, Johanson Aff. ¶ 24; Ex. L at 61–62).

On December 7, 2008, Thompson submitted an inmate request for a replacement pair of Spot Bilt or Dr. Comfort soft/orthopedic shoes (Ex. W; *see* Ex. B, Johanson Aff. ¶ 25).  Mr. Calhoun, the new HSA, forwarded Thompson's request to the Nurse Practitioner for evaluation, pursuant to the FDOC Special Shoe Policy (*id.*).  Nurse Practitioner Carroll re-requested a Brace Clinic consult on December 15, 2008, which Thompson signed on December 21 (Ex. B, Johanson Aff. ¶ 25; Ex. L at 64, 65; Ex. P at 13).  On January 15, 2009, Nurse Practitioner Carroll noted that UM denied the

Brace Clinic consult and instructed that the institution was to purchase shoes, so Carroll prescribed a pair of size 12E Spot Bilt or Dr. Comfort (Ex. B, Johanson Aff. ¶ 25; Ex. L at 68).  Five days later, on January 20, 2009, during Thompson's clinical consult with Nurse Practitioner Kormann, Thompson again requested shoes (Ex. L at 69).  Nurse Practitioner Kormann noted that Nurse Practitioner Carroll had prescribed the shoes and forwarded Thompson's chart to HSA Calhoun to order them (Ex. L at 70).  On February 10, 2009, HSA Calhoun noted that Nurse Practitioner Carroll had prescribed the shoes (*id.* at 71).  However, on February 18, 2009, Dr. Richardson, the CHO, discontinued the order for shoes because Thompson did not meet the criteria (Ex. B, Johanson Aff. ¶ 25; Ex. L at 71).  Dr. Richardson revisited Thompson's request for shoes on April 7, 2009, and prescribed a pair of Dr. Comfort shoes to be used with Thompson's insoles (Ex. B, Johanson Aff. ¶ 25; Ex. L at 72).  The shoes were issued to Thompson on August 24, 2009 (Ex. X).

Following the time period when Thompson wore the October 2007 shoes, medical staff noted that he exhibited no injury within his lower extremities (*see* Ex. B, Johanson Aff. ¶ 26).  On July 2, 2008, Dr. Isra noted that Thompson's legs were "good" (Ex. R at 4).  On July 10, 2009, Dr. Richardson noted that Thompson's extremities were within normal limits (*id.*; Ex. R at 7).  On September 4, 2009, Dr. Franco reviewed x-rays performed on Thompson's knees, finding no fractures or dislocations, and only changes associated with arthritis (Ex. B, Johanson Aff. ¶ 26; Ex. Y at 3).  On February 4, 2010, Dr. Gamma did a neurological examination of Thompson, noting that his gait was "ok" (Ex. Y at 7), meaning that Thompson did not have difficulty with ambulation (Ex. B, Johanson Aff. ¶ 26).

IV.   LEGAL STANDARDS

A.   Summary Judgment Standard

In order to prevail on her motion for summary judgment, Windsor must show that Thompson has no evidence to support his case or present affirmative evidence that Thompson will be unable to prove his case at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986).  If Windsor successfully negates an essential element of Thompson's case, the burden shifts to Thompson to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* Thompson must show more than the existence of a "metaphysical doubt" regarding the material facts. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. <u>Cordoba v. Dillard's, Inc.</u>, 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." <u>Young v. City of Palm Bay, Fla.</u>, 358 F.3d 859, 860 (11th Cir. 2004); *see also* <u>Celotex Corp.</u>, 477 U.S. at 324. Thompson must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. <u>Celotex Corp.</u>, *supra*; <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); <u>Hammer v. Slater</u>, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Thompson in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, Thompson still bears the burden of coming forward with sufficient evidence of every element that he must prove. <u>Celotex Corp.</u>, 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp.</u>, 477 U.S. at 322.

B.     <u>Eighth Amendment – Deliberate Indifference to Medical Need</u>

It is well settled that the government has a constitutional duty to provide minimally adequate medical care to prisoners. <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1504 (11th Cir. 1991). Medical treatment violates the Eighth Amendment "only when it is 'so grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 1505 (citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)). Incidents of mere negligence or malpractice do not rise to the level of constitutional violations. *Id.* (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).

Stating an Eighth Amendment claim of denial of adequate medical care requires satisfying both an objective and subjective component. Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000). First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal civilized measure of life's necessities.'" *Id.* (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (internal quotation omitted)). Second, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment. *Id.* (citations omitted).

Both the objective and subjective components encompass two subsidiary requirements. Taylor, 221 F.3d at 1258. As to the objective prong, an objectively serious deprivation requires showing an objectively "serious medical need." Estelle, 429 U.S. at 104. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *see* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). In addition, an objectively serious deprivation requires showing the response made by the defendant to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 105–06 (internal quotation marks omitted); *see* Taylor, 221 F.3d at 1257; *see also* Adams v. Poag, 61 F.3d 1537, 1543–44 (11th Cir. 1995).

To show the required subjective intent to punish, the plaintiff must demonstrate that the defendant acted with an attitude of "deliberate indifference." Estelle, 429 U.S. at 105. "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245–46 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) and

<u>Taylor</u>, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need")).

A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference.  <u>Harris v. Coweta County</u>, 21 F.3d 388, 393 (11th Cir. 1994).  However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made.  <u>Harris</u>, 941 F.2d at 1507 (quoting <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1035 (11th Cir. 1989)).  To do otherwise would be "to constitutionalize claims that sound in tort law."  <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

A delay in providing medical treatment can constitute deliberate indifference.  <u>Estelle</u>, 429 U.S. at 104–05.  However, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."  <u>Townsend v. Jefferson County</u>, 582 F.3d 1252, 1259 (11th Cir. 2009).


C.      <u>Eleventh Amendment Immunity</u>

The Eleventh Amendment is an absolute bar to suits for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities.  <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); <u>Edelman v. Jordan</u>, 415 U.S. 651, 662–63, 94 S. Ct. 1347, 1355–56, 39 L. Ed. 2d 662 (1974).  Absent waiver or express congressional abrogation, neither of which is present in this case, the Eleventh Amendment prohibits a suit against a state in federal court.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).  Florida has not waived its Eleventh Amendment immunity from suit in federal court.  <i>See</i> Fla. Stat. § 768.28(17).  Furthermore, Congress did not intend to abrogate a state's Eleventh Amendment immunity in § 1983 damage suits.  <u>Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation</u>, 49 F.3d 1490 (11th Cir. 1995).  Florida has not waived its sovereign immunity or consented to be sued in damage suits

brought pursuant to § 1983.  *See* <u>Gamble v. Fla. Dep't of Health & Rehabilitative Servs.</u>, 779 F.2d 1509, 1513 (11th Cir. 1986).

      D.     <u>Qualified Immunity</u>

      The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  This doctrine is intended to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  <u>Pearson v. Callahan</u>, --- U.S. ----, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

      In <u>Saucier v. Katz</u>, the Supreme Court mandated a two-step process for lower courts to follow in resolving qualified immunity claims.  533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).  First, the court had to decide whether the facts that the plaintiff alleged showed a violation of a constitutional right.  *Id.*  Second, if the plaintiff satisfied the first step, the court had to determine whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  <u>Pearson</u>, 129 S. Ct. at 816 (quoting <u>Saucier</u>, 533 U.S. at 201, 121 S. Ct. 2151).

      The Supreme Court revisited <u>Saucier</u>'s mandatory two-step inquiry in <u>Pearson</u>.  *Id.*, 129 S. Ct. at 815–18.  The Court held that while the <u>Saucier</u> process is often appropriate, "it should no longer be regarded as mandatory"; rather, "[t]he judges of the district courts and the court of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 818.

V.    DISCUSSION

      Windsor contends she is entitled to qualified immunity from liability because the evidence shows that Thompson will be unable to prove a constitutional violation at trial (Doc. 218 at 17–21). Windsor contends Thompson will be unable to satisfy the objective element of the Eighth Amendment standard, that is, that he had a serious medical need (*id.* at 17–18).  She further contends Thompson will be unable to prove the subjective component, that is, that she was

subjectively aware of any facts suggesting that Thompson was at substantial risk of serious harm if he did not receive replacement shoes (*id.* at 18–21). Windsor additionally argues that from 2007 to date, there was no clearly established constitutional right regarding the denial by an administrator of replacement shoes issued by health services (*id.* at 22–23).

Viewing the evidence in the light most favorable to Thompson, Thompson has failed to come forward with sufficient evidence to demonstrate a genuine issue of material fact as to whether his need for a pair of Spot Bilt or Dr. Comfort shoes during the 17-month period between October 24, 2007 (the date he received new, albeit allegedly ill-fitting, soft shoes) and March 6, 2009 (the date he filed the instant lawsuit) was a serious medical need for Eighth Amendment purposes. The contemporaneous medical records and opinions of the medical doctors show that none of his examining physicians prescribed or officially ordered replacement shoes within that time. Although Nurse Wynn apparently forwarded Thompson's chart to Windsor's office on November 16, 2008, to order Spot Bilt shoes, there is no evidence that a treating physician or supervising administrator, such as the CHO, had completed or otherwise approved an order for the shoes at that time, which was required by the FDOC Special Shoe Policy (Ex. D, Ciungu Aff. ¶ 4). Additionally, when Nurse Practitioner Carroll initiated an order for new special shoes on January 15, 2009, the order was discontinued by the CHO (and then reconsidered two months later and approved, which led to his receiving the new pair in August of 2009). In the absence of evidence that a physician had mandated replacement shoes, or sufficient evidence from which a jury could conclude that Thompson's need for replacement shoes was so obvious that even a lay person would easily recognize the necessity for shoes, Thompson has failed to show a genuine issue of material fact as to whether he had a serious medical need for Eighth Amendment purposes.

Additionally, without a prescription or official order from a doctor or the CHO, the FDOC Special Shoe Policy prohibited Windsor from replacing Thompson's special shoes until October 24, 2008, one year from the date he received the ill-fitting soft shoes. Although Thompson argues Windsor was deliberately indifferent for failing to consult with Dr. Ciungu in December of 2007 to determine whether he intended to order replacement shoes, her failure to do so is irrelevant, since there is insufficient evidence to show a genuine issue of material fact as to whether Dr. Ciungu would have authorized an order for shoes—Dr. Ciungu states in his affidavit that he did <u>not</u> intend

to prescribe a pair of Spot Bilt shoes or otherwise order the administration to purchase shoes for Thompson; and Thompson has failed to provide sufficient evidence to create a genuine issue as to this fact.

Furthermore, even when Thompson was eligible for a replacement pair, in October of 2008, his failure to receive new special shoes was not due to Windsor's conduct. As previously noted, although Nurse Wynn apparently forwarded Thompson's chart to Windsor's office on November 16, 2008, to order Spot Bilt shoes, there is no evidence that a treating physician or supervising administrator, such as the CHO, had completed or otherwise approved an order for the shoes at that time, which was required by the FDOC Special Shoe Policy. Additionally, as discussed, when Nurse Practitioner Carroll initiated an order for new special shoes on January 15, 2009, the order was discontinued by the CHO (and then reconsidered two months later and approved, which led to his receiving the new pair in August of 2009). Moreover, Thompson's argument that Windsor exhibited deliberate indifference because the FDOC Special Shoe Policy was not consistently followed is unavailing. Even if the policy was not consistently followed, Windsor's compliance with the policy was not objectively unreasonable. Therefore, Thompson has also failed to demonstrate a genuine issue of material fact as to whether Windsor's conduct was deliberately indifferent.

Finally, the court will address Thompson's argument that the Special Shoe Policy is unconstitutional on its face because it denies special shoes to inmates with medical conditions that are "unseen by the clinician's eyes" or "unseen inward bodily deformities," such as degenerative joint disease, muscle diseases, spinal cord injuries, herniated discs, and "internal" damage to feet, ankles, knees, hips, and the like. According to Dr. Johanson's affidavit, although the FDOC Special Shoes policy does not expressly allow for the issuance of special shoes based on a neurological condition, the policy allows a clinician discretion to prescribe special shoes for a patient with such a condition when the clinician determines it is justified by the results of appropriate testing or other clinical indicators (Ex. B, Johanson Aff. ¶ 7). The policy of requiring supporting test results or other clinical indicators prior to issuing a prescription for special shoes is not unreasonable, and is certainly not facially unconstitutional. Moreover, there is no evidence that Windsor, as HSA, was

a policymaker.  Therefore, Thompson is not entitled to relief on his claim that the policy itself is unconstitutional.

Based upon the foregoing, Thompson has failed to show a constitutional violation with regard to his failure to receive special shoes.  Accordingly, Windsor is entitled to qualified immunity with respect to Thompson's claims for monetary damages against her in her individual capacity, and his claims for declaratory and injunctive relief are foreclosed.[5]

Accordingly, is it **ORDERED**:

Plaintiff motion to strike (Doc. 228) is **DENIED**.

And it is respectfully **RECOMMENDED**:

1.      That Defendant's second motion for summary judgment (Doc. 218) be **GRANTED**.

2.      That final judgment be entered for Defendant.

At Pensacola, Florida this 9th day of December 2010.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[5] Thompson's claims for monetary damages against Windsor in her official capacity were previously dismissed.